

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00428-CR

_____

BOBBY JAMES GUILLORY, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1548748R

Before Bassel, Pittman, and Womack, JJ.
Per Curiam Memorandum Opinion

## MEMORANDUM OPINION

## I. Introduction

The jury found Appellant Bobby James Guillory guilty of multiple counts of capital murder for his role in the death of an elderly couple.[1] The jury assessed his punishment on each count at incarceration for life in the Texas Department of Criminal Justice, and the trial court sentenced him accordingly and ordered the sentences to run concurrently. Appellant raises three issues on appeal.

In his first issue, Appellant argues that the evidence is insufficient to establish that he had the culpable mental state necessary to support a finding that he intentionally or knowingly caused the deaths of the victims. Eventually, he argues that a motive to kill the victims *might* not have existed or that it is not "completely implausible" that he was unaware that his acts would cause the victims' deaths. The crux of Appellant's first issue challenges the finding not because the jury drew an unreasonable inference but instead because it did not adopt the reasonable inference that he advocated. This argument misapprehends the standard of review under which we operate. Our role is not to balance which reasonable inference is the most reasonable (or plausible); that is the jury's role. We determine only whether the record contains evidence from which the jury could draw a reasonable inference that

---

[1]The first count charged Appellant with capital murder under section 19.03(a)(7)(A) of the penal code, while the second and third counts charged Appellant with capital murder under section 19.03(a)(2) of the penal code. *Compare* Tex. Penal Code Ann. § 19.03(a)(7)(A), *with id.* § 19.03(a)(2).

Appellant intentionally or knowingly caused the deaths of the victims. Here, motive, the method of causing the deaths of the victims, and Appellant's efforts to conceal the crime all demonstrate that the jury made reasonable inferences that Appellant intentionally or knowingly caused the victims' deaths.

In his second issue, Appellant asserts that he received three life sentences for the same crime in violation of the constitutional protection against double jeopardy. The State concedes error on this issue. The remedy suggested by the State—which we adopt—is to affirm the judgment on count one in which Appellant was charged with capital murder under section 19.03(a)(7)(A) of the penal code and to render judgments of acquittal for counts two and three in which he was charged with capital murder under section 19.03(a)(2) of the penal code.

In his third issue, Appellant makes various claims of ineffective assistance of counsel. These challenges to his trial counsel's performance generate more heat than light. None of the challenges reach the level of ineffectiveness that would allow us to resolve them on the record before us on direct appeal. Nor does Appellant attempt to demonstrate that the errors are of such magnitude as to put the reliability of his trial's result in question.

Accordingly, we affirm the judgment on count one in which the jury found Appellant guilty of capital murder under section 19.03(a)(7)(A) of the penal code but reverse and render judgments of acquittal on counts two and three in which the jury found Appellant guilty of capital murder under section 19.03(a)(2).

## II. Factual background

The victims in this case are Long Nguyen, age seventy-two, and his wife Huong Ly, age sixty-three. In June 2012, their neighbor and in-law noticed that a screen had been removed from a window of the victims' apartment and that the window was slightly open. The neighbor had been with the victims at a birthday party the night before and had called her son, the victims' son-in-law, to report the odd state of the window. In response to a 911 call made by the son-in-law, an officer was dispatched to conduct a welfare check at the victims' apartment.

When the officer arrived, a number of the members of the victims' family were already present and in a state that she described as "very agitated," with an adult male in the group crying, "[M]om, [M]om, [M]om, [M]om." The officer taking the call received no answer from knocking on the apartment's door and entered the apartment through the open window, calling for a response from the apartment's occupants. She received no response and assumed that the victims were not at home. To complete her check, she made her way into a bedroom where her eye caught what appeared to be blood on the wall.

To clear the bedroom, the officer opened a closet door and confronted a scene that she described, and which is graphically portrayed in various crime-scene photos, as follows:

> I open the door to the closet. It only took one second, and in that one second, I -- I saw two -- two bodies stacked on top of each other that appeared to be bound with duct tape. In that one second[,] it looked as

4

if the [Asian] female had plastic on her head. I saw blood everywhere. I saw a pool of blood next to the male's head.

Duct tape was wrapped around the victims' faces. The scene that she found was so shocking that she was momentarily unable to speak to the fire department personnel who had also been dispatched and could only key her radio but not respond when the dispatcher asked what she needed.

The scene produced a massive law-enforcement response. Various police officers and crime-scene investigators testified at trial. The crime-scene unit of the Arlington Police Department spent six days processing the 400-square-foot apartment.

Various witnesses described and photos depicted how the victims' hands and feet were bound with duct tape and how their heads were wrapped with duct tape. The female victim was wrapped in twenty-one feet of tape that covered the area from her chin to her eyes. The male victim was wrapped in almost ten feet of tape that covered the area from his chin to over his nose, and his head was so tightly wrapped that it deformed his nose. Both victims had also been struck repeatedly with an object that lacerated their heads. Autopsies of the victims established that the cause of both their deaths was "suffocation, obstruction of airway by the [wrapping of] duct tape [around their faces]."

Witnesses also testified to the state of the victims' apartment, with one describing it as in disarray but "not really gone through." Several witnesses described

various items placed in the apartment, such as a dish containing crushed pills, a cigar filled with marijuana, cigar paper, and a beer bottle wrapped in a blue bandanna. An officer and the lead detective investigating the scene thought that the scene suggested that a gang party had occurred.[2]

Though the presence of items in the apartment—such as several items of jewelry—did not seem consistent with a burglary, investigators questioned the usual robbery and gang suspects. This pursuit yielded nothing. One item that gave the hope of a solution was a DNA sample extracted from the cigar wrapper found in the apartment. Initially, the sample did not help because it produced no matches in law-enforcement databases. And the case ultimately went cold.

The investigation revived three years later in 2015. A DNA sample entered into a law-enforcement database from a person who had stolen a horse in Houston matched the sample extracted from the cigar paper found in the victims' apartment. That sample belonged to W.G.[3] Police interrogated and eventually arrested W.G. Interviews of W.G. led to the arrest of Appellant, who is W.G.'s biological great-uncle and his adoptive father.

---

[2]For example, bandannas are usually a sign of gang activity, and the blue bandanna wrapped around the beer bottle was a possible calling card of the Crips gang.

[3]Because the record reflects that W.G. was sixteen years old at the time of the offense, we use initials to protect his identity. *See* Tex. R. App. P. 9.8(a), (c)(2).

6

The lead investigator interviewed Appellant twice after W.G. was arrested, and the jury saw a video and received a transcript of Appellant's third interview that was conducted after Appellant's arrest.[4] The investigative leads produced by W.G.'s arrest and the statement made by Appellant during the interview after his arrest revealed that the staging of the apartment to suggest gang violence was a ruse. Instead of being a random act of gang violence that the staging of the apartment portrayed, the victims had died from an act specifically targeted against them—an act that had its origins within their own family.

The central figure in the reality of what happened to the victims was an individual named Dephne Wright. Her motive, planning, and involvement spanned from the victims' family members to Appellant.

Dephne knew and was apparently owed money by the victims' son-in-law. Dephne and the son-in-law shared an interest in voodoo. The son-in-law's visits with Dephne and their shared interest in voodoo was confirmed by the victims' grandsons (who were in no way implicated in the murders). The victims' grandsons and other witnesses also established that the son-in-law and the victims were in business together.

Dephne had allegedly used Appellant's romantic involvement with an associate of hers and his dire financial condition to draw him into a scheme that led to the

_____

[4]Portions of the third interview that are quoted throughout this opinion have been taken from the transcript.

7

victims' deaths. Appellant was promised $10,000 for his participation. Appellant's description of the scheme shifted throughout his recorded interview. In essence, the scheme had three alternate explanations: (1) Dephne thought that the victims kept a large amount of cash in their apartment, and she wanted Appellant to break into their apartment to find and steal the cash; (2) Dephne wanted Appellant to kill the victims so that their son-in-law could collect on a life insurance policy; or (3) Dephne and the son-in-law wanted the victims disabled so that they could no longer handle their own affairs, which would allow the son-in-law to take over handling them. The jury did not hear a more detailed explanation of the scheme because when Dephne, her associate who allegedly used a sexual relationship to ensnare Appellant into the scheme, and the victims' daughter and son-in-law were called to testify, each refused and invoked his or her right against self-incrimination. But it was undisputed that Dephne successfully enlisted Appellant to do her bidding.

The break-in on the night the victims died was planned to occur while they were out of the apartment at a dinner with the family of their daughter and son-in-law. Appellant recruited W.G., who was described as mentally challenged, to assist him that night. They traveled from Houston to Arlington and used a key provided by Dephne—that had been provided to her by the son-in-law—to gain entry into the victims' apartment on the night of the dinner.

Appellant stated that he repeatedly told Dephne that he would not kill the victims, but he also acknowledged that Dephne had dispatched him to Arlington with

8

the expectation that the victims would be killed. Whatever their plans or instructions, W.G. and Appellant broke into the apartment.

Appellant claimed that he and W.G. had been searching the apartment for an hour when the victims unexpectedly returned. Appellant stated that the lacerations on the victims' heads came when they were struck with a pole from a closet in an attempt to silence them. This story conflicted with the testimony of the medical examiner that the victims' head wounds were consistent with blows from a hammer that the son-in-law claimed was kept by the male victim as a weapon for self-defense.

But there was no question regarding how the victims came to have their heads wrapped in duct tape. Appellant admitted that either he instructed W.G. to wrap them or that both he and W.G. wrapped their heads in tape. Ignoring the yards of tape used on the victims' heads, Appellant claimed that he had intended to cover only their mouths and that the amount of tape placed on them was a mistake because Appellant and W.G. were doing the wrapping in the dark. Appellant also admitted staging the apartment to give the appearance of a gang party.

Appellant found no money in the apartment other than the one hundred dollars that W.G. removed from the female victim's purse. Appellant claimed repeatedly that he had received no money from Dephne for carrying out the scheme. No matter Appellant's claim that he had not profited, the lead investigator confirmed that the victims' son-in-law received a large life insurance payout. Also, though Appellant claimed that he had fallen victim to being enlisted into the scheme because

9

his financial condition was so poor that he was on the verge of homelessness, after the event, he purchased two vehicles with notes that totaled more than $50,000. Appellant, however, maintained that the vehicle purchases were not made in anticipation of a bounty from the crime.

Appellant initially maintained that he did not know until after W.G. was arrested in 2015 that the victims had died. This story changed when he acknowledged that he knew of their deaths in 2012 and that he was told of their deaths the day after the crime.

Appellant was indicted for five counts of capital murder. The indictment relied on three bases to increase the charge from murder to capital murder. One count charged that Appellant had committed two murders in the course of a single criminal transaction. The second and third counts alleged that Appellant had murdered each victim during the course of a burglary. The fourth and fifth counts alleged that Appellant had murdered each victim for remuneration or the promise of remuneration. The State abandoned the fourth and fifth counts before the court's charge was submitted to the jury. The jury found Appellant guilty of the remaining three counts of capital murder.

### III. There is sufficient evidence to support a reasonable inference that Appellant intentionally or knowingly caused the deaths of the victims.

When interviewed after his arrest, Appellant admitted his presence in the victims' apartment when they were killed and even that he had directed wrapping the

10

duct tape around their heads that suffocated them or that he had wrapped their heads with his own hands. But he tried to distance himself from the mental state that made his acts murder. He disavowed that he had gone to the apartment to kill the victims or that he had wrapped their heads with tape for any purpose other than to keep them quiet. His trial counsel asked the jury to take his word from the protestations he offered to distance him from the most heinous aspects of the crime. The jury rejected his take-my-word-for-it defense.

Appellant's theory on appeal is that the inferences raised by his protestations that he did not intend to kill the victims are reasonable and are not completely negated by the record. This argument is of no avail to Appellant because the jury could pick between the inferences reasonably raised by the evidence even if the evidence did not negate a contrary, but still reasonable, inference. Thus, our task is limited to determining whether the record contains evidence from which the jury could draw a reasonable inference that Appellant acted with an intentional or knowing culpable mental state. It does.

### A. The standard of review and types of evidence from which a jury may infer that an act was done intentionally or knowingly

Appellant's first issue challenges both the legal and factual sufficiency of the evidence to support his conviction but then quotes at length from the authority of the court of criminal appeals that establishes that only a single method of review applies in criminal cases. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010)

11

(citing *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979)). That standard, dictated by the United States Supreme Court, is one of legal sufficiency, and it is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Id.*

Usually, we perform this review by comparing the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012). Appellant challenges only the evidence supporting whether he had the requisite culpable mental state to sustain the underlying offense of murder upon which the offense of capital murder was based.[5] Thus, because we are not required to review what Appellant did not brief, we will focus on that element of the offense. *See, e.g., Burks v. State*, No. PD-0992-15, 2017 WL 3443982, at *1 (Tex. Crim. App. June 28, 2017) (op. on reh'g) (not designated for publication).

---

[5]As Appellant correctly notes, the offense of capital murder requires a finding that the defendant committed an offense under the section of the Texas Penal Code defining murder. Specifically, section 19.03(a) of the penal code defining the offense of capital murder states, "A person commits an offense if the person commits murder as defined under [s]ection 19.02(b)(1) [the section of the penal code defining murder] and" then specifies other predicate acts making the offense capital murder. Tex. Penal Code Ann. § 19.03(a); *see also Graham v. State*, 19 S.W.3d 851, 853 (Tex. Crim. App. 2000) ("As a predicate to charging capital murder, the [Texas] Penal Code requires that a defendant commit murder as defined under § 19.02(b)(1). That predicate murder is aggravated to *capital* murder where any one of eight additional circumstances are present." (citation omitted)).

The guiding principles that we will follow in performing our sufficiency review are as follows:

> When reviewing the sufficiency of the evidence, we view the evidence "in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimonies, and the reviewing court must not usurp this role by substituting its own judgment for that of the jury. The duty of the reviewing court is simply to ensure that the evidence presented supports the jury's verdict and that the State has presented a legally sufficient case of the offense charged. When the reviewing court is faced with a record supporting contradicting inferences, the court must presume that the jury resolved any such conflicts in favor of the verdict, even if not explicitly stated in the record. "Under this standard, evidence may be legally insufficient when the record contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt."

*Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) (citations omitted).

Our approach to review is holistic: we "must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). Or to slightly vary the theme of a broad perspective, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993), *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994), and *Alexander v. State*, 740

S.W.2d 749, 758 (Tex. Crim. App. 1987)); *see also Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013) (same).

Further, to elaborate on a principle of central application to this appeal, the jury may choose from multiple inferences raised by the evidence so long as they are reasonable; the process does not require the jury to find that the evidence negates an inference that it does not choose, even if that contrary inference is also reasonable.[6] In other words, the jury may select a reasonable inference consistent with guilt even though there are reasonable inferences inconsistent with guilt.

---

[6]This court recently described the jury's ability to select between reasonable inferences even if the evidence does not negate the inference that the jury did not select:

> The reasonable-alternative-hypothesis theory does not apply to an evidentiary-sufficiency review. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("For the evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt."); *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012) (discounting an alternative hypothesis that a court of appeals had proposed with respect to a theft conviction). It is unnecessary for every fact to point directly and independently to the accused's guilt; it is enough if the cumulative force of the incriminating evidence warrants a guilty finding. *Dobbs [v. State]*, 434 S.W.3d [166,] 170 [(Tex. Crim. App. 2014)]; *Temple*[, 390 S.W.3d at 359]. The court of criminal appeals has in any event disavowed the reasonable-alterative-hypothesis construct. *See Ramsey v. State*, 473 S.W.3d 805, 811 (Tex. Crim. App. 2015). Put differently, the proof-beyond-a-reasonable-doubt standard does not require the State to disprove every conceivable alternative to a defendant's guilt. *Id.* at 808.

*Thompson v. State*, No. 02-15-00301-CR, 2017 WL 710630, at *3 (Tex. App.—Fort Worth Feb. 23, 2017, pet. ref'd) (mem. op., not designated for publication).

Our approach to review remains the same whether the evidence is direct or circumstantial. *See Jenkins*, 493 S.W.3d at 599. And the principles outlined apply with equal force when we review a sufficiency challenge directed at a finding of the defendant's culpable mental state:

> In a sufficiency review, we afford the jury's inference of culpable intent as much deference as we do to the evidence supporting proof of culpable conduct. As long as the jury's finding of a culpable intent "is supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable."

*Isassi v. State*, 330 S.W.3d 633, 643 (Tex. Crim. App. 2010) (citation omitted) (quoting *Laster v. State*, 275 S.W.3d 512, 520–21 (Tex. Crim. App. 2009)).

It is a long-standing rule that a jury may look to many sources to draw reasonable inferences about the defendant's intent:

> [a] jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of wounds inflicted on the victims. A jury may also infer knowledge from such evidence. This has been the rule in Texas for over 100 years.

*Hart v. State*, 89 S.W.3d 61, 63–64 (Tex. Crim. App. 2002) (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999)). And to further elaborate on why the question of intent must rely on inferences and the sources from which to draw the inferences for a charge of murder, the court of criminal appeals has stated that

> [b]y its nature, a culpable mental state must generally be inferred from the circumstances. We cannot read an accused's mind, and absent a confession, we must infer his mental state from his "acts, words and conduct." The culpable mental state for murder can be inferred from a defendant's motive, his attempts to conceal the body, and implausible

15

explanations to the police. The defendant's culpable mental state may also be inferred from the extent of the victim's injuries.

*Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018) (citations omitted).

## B. The culpable mental states associated with the offense of murder

A person commits the offense of murder when he "intentionally or knowingly causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(1). In turn, the penal code states, "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). The penal code also provides that

> [a] person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

*Id.* § 6.03(b).

## C. Analysis

### 1. The jury could reasonably infer that Appellant intentionally or knowingly caused the victims' deaths from his motive for committing the offense.

Appellant argues that he must not have planned to kill the victims because he said that he did not intend to and that he did not profit from the crime because the person who had enlisted him to commit the crime did not pay him as promised. In the words of Appellant's brief, "there was not a single witness or piece of evidence

16

that demonstrated that [he] had gained financially from the murders or that he had agreed to kill the victims for a fee or a vehicle."

The claim that there is no evidence that he agreed to kill the victims for a fee is countered by Appellant's acknowledgment that the person who had enlisted him to join the scheme had sent him to the victims' apartment with the expectation that he would kill the victims. His honor-among-thieves argument—that he was never paid—begs the question and is based on the facially flawed logic that because the person who had orchestrated the scheme reneged on her promise to pay him to commit the crime, the evidence is conclusive that there was never an agreement.

Throughout his interview, Appellant stated that Dephne planned the crime and gave him a key to gain access to the victims' apartment. His story swung wildly about regarding what the purpose of the crime was; the story varied between claims that the crime was planned (1) to find thousands of dollars that were allegedly hidden in the apartment, (2) to disable the victims so that they could no longer run their affairs, and (3) to kill the victims and collect on their life insurance. As the story swung between these various motives, Appellant repeatedly claimed that he had told Dephne that he would not kill the victims and was ignorant of her sinister motives. No matter how the story swung, at one point, Appellant acknowledged one scenario regarding how he would be paid for committing the crime, stating, "I guess when [the son-in-law] or whatever got the insurance money[,] they was gonna give it to Dephne[,] and she was gonna give me some money, which it was all a set up[;] she never gave me nothing."

Most damagingly, Appellant was compelled to acknowledge that to carry out the crime as planned by Dephne, the victims had to be killed. During Appellant's third interview, he stated that it was Dephne's intention for him to kill the victims:

[Q]: . . . And because their death happened, that is when life insurance kicks in. So, I want you to understand the process. *So either one would have to say this: Dephne wanted you to go down there and gave you a key, her intentions were for you to kill them right?*

[A]: *[H]er intentions.* But the trick is[.]

[Q]: Yep[.]

[A]: [B]ut we didn't know none of that. It was a setup[.]

[Q]: [B]ut yours[.]

[Q]: [I]t may not be yours but let's just go with, the initial intentions when you went down and came to Arlington okay[?]

[A]: [B]ut what she said was to get money. There's a lot of money, from what she was saying like maybe 100,000 was in there. [Emphasis added.] [Video time references omitted.]

Though he continued to deny that his intentions matched Dephne's, Appellant later had to acknowledge that Dephne had intended for him to kill the victims and that he knew it:

[Q]: . . . . When you, when Dephne gave you a key to that apartment, you drove to Arlington. *Was it, was Dephne under the impression that you were going to kill the couple?*

[A]: *[S]he was.* Me and Willie wasn't.

[Q]: I understand. We are just going on Dephne.

[A]: [Y]eah[.]

18

[Q]: *Dephne was under the impression that you were going to kill the couple?*

[A]: [I]f*, if uh, if we didn't find the money* and uh, she says, but you will find the money, and I said Dephne, I don't want to hurt nobody[,] and she said oh, she keeps the money in there I done seen that.

[Q]: [O]kay.

[A]: [Y]ou know and you got, you got a lot of time because she['s] having dinner with this, and they ain't gonna be back until 10, 10[:]30, 11 o'clock that night[.]

[Q]: [U]mhm, okay. And so, but you, we do now know what Dephne's intention for you to go down to kill the couple. You and Willie may have had other intentions[,] right? *So, so, just for we can be clear here, Dephne's intention when you were going down was to kill the couple right?*

[A]: *(nods head)*

[Q]: *[A]re you comfortable with that?*

[A]: *[Y]es*[.] [Emphasis added.] [Video time references omitted.]

And in a later exchange:

[Q]: *[B]ut you understand from Dephne's point of view, she always thought your intentions were to kill them[?]*

[A]: *[T]hat is her intentions* because I told her I didn't[.]

[Q]: [B]ut, but you understand what, what her intentions, if I understand you right, she wanted you to kill them right? If I understand you right, she wanted you to kill them? Right? And if I understand you right, and I don't know if you know from his perspective, [the son-in-law's] perspective, but from Dephne's perspective is, *she wanted you to kill them[,] the couple right?*

[A]: *(nods head)*

19

[Q]: *[S]he would have been disappointed had you not killed them, I am assuming[,] right?*

[A]: *[G]uess so*, but it didn't really matter to me. [Emphasis added.] [Video time references omitted.]

Thus, Appellant acknowledged that the person who had enlisted him to commit the crime had done so with the intent that he would kill the victims. As set forth above, motive is a circumstance from which a jury may reasonably infer a culpable mental state. *See Nisbett*, 552 S.W.3d at 267. Though he protested that he did not operate under this motive, the jury was not bound to accept this evasion; it could reasonably infer that Appellant had acted on the motive that he admitted had motivated the crime and that he was enlisted to carry out.

Nor did the fact that he was not paid for his crime negate any inference of an intent consistent with guilt. Appellant's argument is premised on the fact that the State did not submit its murder-for-remuneration capital murder counts to the jury and could not prove that Appellant actually received any money for his crime. The substance of the argument is that

> [o]nce the State abandoned the murder[-]for[-]hire counts[,] thus essentially admitting that the re[mun]eration theory of the case had failed before it could be put to the jury, it became a game[-]changing factor in determining motive. In other words, the State tried the case as a murder[-]for[-]hire scheme, abandoned it completely, but still reaped the benefits of delving into the Appellant's finances to prove a motive that might never have existed.

Appellant wants us to annul the jury's verdict based on his conclusion that the record supports an inference that a motive to kill the victims *might* never have existed. This

20

argument asks us to turn a blind eye to Appellant's concession that the person who had enlisted him to commit the crime had assumed that he would kill the victims—a motive and a fact from which the jury could reasonably infer that Appellant had carried out the task that he was hired to perform. *Ingerson v. State*, 559 S.W.3d 501, 510 (Tex. Crim. App. 2018) ("Motive is not an element of murder, but it is a circumstance indicative of guilt."). And the fact that the person who had hatched a scheme to kill an elderly couple for money did not pay Appellant what she had promised reinforces the level of her greed but hardly negates the inference that Appellant performed the act for which he hoped to be paid.

### 2. The jury could reasonably infer that Appellant intentionally or knowingly caused the victims' deaths from the manner in which they were killed.

When interviewed, Appellant claimed that he had not intended to kill the victims but instead intended to tape only their mouths to keep them quiet. He carried this theme forward to trial and now to appeal. But the record—primarily in the form of Appellant's own words—contains evidence from which the jury could reasonably infer that he caused the deaths of the victims intentionally or knowingly:

- Appellant either directed the wrapping or himself wrapped the victims' heads with yards of tape.

- His excuse for not knowing how much of their heads were being covered by the tape was that he had taped the victims in the dark. Appellant never

explained why he had no source of light to guide him when he taped the victims' mouths but had been able to perform other activities in the apartment that presumably required a source of light. According to Appellant, he and W.G. had been searching for money in the victims' apartment for an hour before they returned, an activity that is reasonable to assume that he did not conduct by feel, and the apartment was arranged at some point by Appellant and W.G. to make it appear that the crime was gang related.

• Appellant also was careful to state that he had attempted to wrap only the victims' mouths, which is an acknowledgment that he knew the consequences of wrapping duct tape over more than their mouths.

These circumstances make it a reasonable inference that Appellant had wrapped the victims' heads intending to suffocate them or with the awareness that his conduct was reasonably certain to cause that result—no matter his professions to the contrary.

Appellant claimed that duct tape was placed on the victims "just to stop them from hollerin'." There was no question that Appellant either directed or that his own hands wrapped tape around the victims' heads. Initially, Appellant said that he could not remember who had put the duct tape on the victims: "I can't remember that. Can't remember if me or [W.G.] did." But Appellant later acknowledged that the use of the tape was his idea and disclosed what his instructions were: "[W.G.], let's just tape their mouth[s]. . . . [W.G.,] let's just tape their mouth[s] and then, you know[,]

22

let's just tape their mouth[s] and go." Later he stated, "[M]y mistake was with the tape."[7]

And as the interview progressed, Appellant made statements suggesting that his hands applied the tape. He did this by again acknowledging his role in wrapping tape around the victims when he described his reaction to learning that W.G. had been charged with capital murder. This description was not as guarded as his prior statements when he claimed that only W.G. had wrapped the tape around the victims:

> Wishing God, I said, when she said capital murder, I am like, me and him didn't try to kill those people, *we put tape on their mouth[s,]* but they was alive. You know, and I am like well when she first said it and then I thought, well who did he kill, then she said the Asian people and *that is when I said that we only put tape over their mouth[s]*, you know. And I thought when she said that, because [W.G.] had been gone a while seeing this woman in Arlington, I thought maybe he had hurt somebody else[,] you know. And, uh, that is what went through my mind. But then when she says oh, an Asian couple, ya, it was all[.] [Emphasis added.]

At another point, he said, "I really thought that I put the tape on the mouth[,] and I felt bad doing that . . . ."

And the jury saw the results of how Appellant and W.G. had used the tape. The female victim's head was wrapped in twenty-one feet of duct tape, with the tape wrapping her face from her chin to almost covering her eyes. The male victim's head was wrapped in almost ten feet of duct tape that covered his mouth and nose. He

---

[7]Appellant also claimed that he struck the male victim, whom he described as old and sick, because he (Appellant) was too weak physically to restrain him. But Appellant also acknowledged that he had done yard work for Dephne's husband and that he had told his wife that he would be going hunting on the night of the victims' deaths—a lie she believed.

was wrapped so tightly that the wrapping deformed his nose. The medical examiner testified that the victims died as a result of the duct tape suffocating them.

But Appellant wants to sidestep acts that seem so clearly intended to kill by claiming that it was all inadvertent because he and W.G. had wrapped the yards of tape around the victims' heads in the dark.[8] When asked if he knew how high he had wrapped their heads, he said, "No[,] I did not know[;] it was dark." He also said that "it was dark in the closet, we did not have no light, I [didn't] want to use no flashlight, and I was scared someone would see us." In other words, Appellant asked the jury to believe the implausible explanation that he and W.G. had no light available to guide their actions when they wrapped yards of duct tape around the victims' heads but that they had been searching for money in the victims' apartment for an hour and were able to stage various items in the apartment to conceal their role in the crime.

Finally, even if it were plausible to argue that it is only reckless to wrap yards of duct tape around a person's mouth and nose, Appellant's statement to the detective

---

[8]Appellant notes that the medical examiner would not venture an opinion that the amount of tape on the victims' faces suggested an intentional killing. The medical examiner testified that he could not "unequivocally address intent" and speak to whether the "intent was to muzzle them or whatever."

He could testify that the effect of the taping was the cause of death. Appellant pivots off this testimony to argue that without an expert opinion that the application of the tape "was an act deliberately designed to kill the victims, the jury had to infer intent from the totality of the circumstances." We agree, and this accounts for our involved analysis of the record to answer the question of whether evidence exists to support a reasonable inference that Appellant acted with an intentional or knowing culpable mental state.

24

deprived him of that argument. He was careful to state that his instructions to W.G. and his own actions were to place the tape over only the victims' mouths. He stated, "[L]et's just tape their mouth[s] and go." The detective asked, "[D]id you know that you put that duct tape up too high?" Appellant stated, "No[,] I did not know[;] it was dark." Or finally, this exchange:

[Q]: So what you are saying the intention was not to kill.

[A]: [N]o, no sir it was not[.]

[Q]: [O]kay[.]

[A]: [W]hen I put that tape, I was scared, I really was. I said [W.G.], let's just tape their mouth[s].

Indeed, at one point in the interview, Appellant made a gesture demonstrating how he would have only placed a few inches of tape over the victims' mouths. And Appellant acknowledged an obvious fact that it is hard to breathe when tape is placed over the nose and mouth.

Appellant's repeated focus on his concern for putting tape over only the victims' mouths and his acknowledgement that the use of tape makes breathing difficult creates a reasonable inference that he knew at the instant that the tape was applied the deadly consequences of covering more than their mouths. There is an inherent contradiction between his professed concern for the victims' ability to breathe by taping only their mouths and his acts that so clearly would impair their ability to breathe, acts which he knew would have that effect. A jury could infer

25

intent or a knowing act simply from the fact that a person who acknowledges that duct tape makes it difficult to breathe would not apply it to the victims in the fashion that Appellant did unless he intended to cut off their breathing or knew that would be the effect.

And here, Appellant went one step further by his repeated claim that he intended to tape only the victims' mouths. In other words, he knew what method should be used to apply tape so that it would not impair the victims' breathing. Instead of applying a method that would guard the victims' ability to breathe, he employed a method of taping that directly contravened the method that he indicates should have been used to protect a person's breathing. The fact that he opted not to use the method that he acknowledges was the proper method to protect the victims' breathing creates a reasonable inference that Appellant intended to suffocate the victims or that he knew that wrapping their faces as he did would suffocate them.

In essence, Appellant argues that the jury was bound to accept his disavowal of intent or knowledge in the face of evidence from which a reasonable inference may be drawn that he knew the consequences of his act at the instant he was committing it and that he did not use the method of taping the victims that he acknowledges should have been used if their breathing was not going to be impaired. Merely quoting such an argument refutes it.

And we also reject Appellant's argument that the jury could not find the necessary intent because some facts allegedly pointed to the possibility that Appellant

26

and W.G. did not take with them the means to commit the murder. This argument relies on the fact that there is no evidence that Appellant and W.G. took a quiet means to kill the victims such as a knife or rope and that Appellant may have used duct tape found in the apartment to suffocate the victims. First, the record does not reveal what weapons Appellant and W.G. had in their possession when they broke into the apartment or thought that they would need to kill an elderly couple. They could have decided that duct tape found in the apartment, among the other means available to kill the victims, was the quietest and most efficient way to kill.

Second, the argument assumes that the only way to prove the intent to kill the victims was that Appellant had pre-planned their deaths. Appellant would be no less guilty of "intentionally or knowingly" causing the deaths of the victims if he decided to kill them once they arrived home to find him and W.G. in their apartment and used duct tape that he found in the apartment as a ready means to silently take their lives. *See* Tex. Penal Code Ann. § 19.02(b)(1). Like so many of Appellant's arguments, this argument is an attempt to emphasize inferences that "point[] away" from his guilt and to simply ignore contrary inferences. The jury was not bound to accept only the inferences that point away from guilt and to reject reasonable inferences that point toward guilt.

27

**3. The jury could reasonably infer that Appellant intentionally or knowingly caused the victims' deaths from the attempt to stage the apartment as the site of a gang party.**

The victims' apartment was staged to make it appear that they were the victims of gang violence. A jury could reasonably infer that the staging of the apartment made sense only if the victims were killed. Otherwise the misdirection would not be effective because victims left alive could describe their attackers.

Officers investigating the crime scene testified that it was arranged to make it appear that a gang party had been held in the apartment. For example, a blue bandanna was wrapped around a beer bottle—the bandanna being a sign of involvement by the Crips. A crime-scene investigator testified that items in the apartment were disturbed but not in complete disarray:

Q. When you -- when you observed the victims' apartment, compared to your experience working other burglaries, is there anything that went through your mind at the time?

A. I did -- I was looking at the scene. I didn't -- I was trying to figure out motives or what might have been a purpose or reason for the offense. And I noticed some [CDs] thrown out in the living room. There was a dining chair tossed on the living room. The -- but pretty much the apartment was still pretty, you know, put together, organized, not real gone through.

Though Appellant initially did not acknowledge the scene was staged to suggest gang activity, he did acknowledge an effort to stage a crime:

[Q]: [O]kay. Um, [d]id you guys stage the apartment to look like some, somebody else was there?

[A]: [W]hat do you mean stage it, like?

28

[Q]: [D]id you stage the apartment and make it look like somebody had come in and break in and broke in or something like that?

[A]: [O]h we knocked some stuff around, yeah[.] [Video time reference omitted.]

At another point, in the interview, Appellant acknowledged placing items in the apartment that investigators viewed as part of the effort to implicate gang activity:

[Q]: [I]t look[ed] like the place was ransacked. You did say y'all turn[ed] some things over intentionally?

[A]: [Y]eah[.]

[Q]: [O]k and um, okay and I am assuming you turn[ed] those things over intentionally to look like, make the place look like it was ransacked right?

[A]: [M]mhm[.] (nods head)

[Q]: [D]o you know what ransacked means?

[A]: (nods head)

[Q]: [A]nd so, but did you also set up some beer bottle and things of that nature to make it look like somebody had just [been] drinkin['] beer? Because the couple don't drink beer. They don't drink beer. So, and that is what specific thing Bobby because you know, go ahead and think about it.

[A]: *Ya. I remember us putting a beer bottle bottles, but I don't remember everything about handkerchiefs. I can't remember everything.* [Emphasis added.]

Finally, he specifically acknowledged the effort to stage the apartment to implicate gang violence:

[Q]: [U]h, that is what [W.G.] did. And this is how we knew he was there, because we got his DNA off of that. Okay and then you urinate

29

and things of that nature, stuff splashes and gets all over the place.  Do you understand how that goes?  And so, um, but the reason, and it was a full joint kind of like left there.  Do you know what I mean, so, so *[W.G.] says you guys staged it to make it look like some gang members had come there because of the bandanna and this and that.*  And I am just asking for clarification[.]

[A]:  *[R]ight[.]*

[Q]:  *[U]h, do you recall doing that as well[?]*

[A]:  *[Y]es[.]*  [Emphasis added.]  [Video time reference omitted.]

As noted in the section of the opinion dealing with the standard of review, a fact probative of intent is the attempt to conceal the crime.  *See Darby v. State*, 145 S.W.3d 714, 721 (Tex. App.—Fort Worth 2004, pet. ref'd) (stating that effort to conceal crime is one factor that jury could consider to infer intent to commit murder).  Appellant admits a conscious effort to conceal by misdirection—an effort that would have failed if the victims who could describe the actual intruders had survived.

We do not know whether the victims came home before or after the efforts to stage the apartment, but it is of no matter.  If the apartment were staged before the couple arrived, it is a reasonable inference that Appellant did not plan to leave them alive to put a lie to the impression created by the staging.  If the staging occurred after the victims returned, it is a reasonable inference that the staging occurred knowing that the couple would not be alive to describe their attackers.

The classic signposts of motive, method, and concealment all supplied reasonable inferences for the jury to determine Appellant's culpable mental state and

signaled that he had intentionally or knowingly caused the victims' deaths. *See Nisbett*, 552 S.W.3d at 267. This is sufficient evidence that Appellant acted with the culpable mental state necessary to support his conviction for the murder of more than one person during the same criminal transaction. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A).[9] We overrule Appellant's first issue.

## IV. Double Jeopardy

In his second issue, Appellant argues that he received multiple punishments for the same criminal act and that this violates the protection against double jeopardy. The State concedes error on this issue. Because of this concession, we will truncate our analysis and apply the remedy suggested by the State.[10]

Three counts of capital murder went to the jury, with the first count involving an offense under section 19.03(a)(7)(A) of the penal code and with the second and third counts involving offenses under section 19.03(a)(2) of the penal code:

---

[9]Though our resolution would be the same, we do not reach the question of Appellant's conviction under section 19.03(a)(2) of the penal code because we render judgments of acquittal on the counts that convicted him under that subsection in response to his second issue. *See* Tex. Penal Code Ann. § 19.03(a)(2).

[10]Appellant raises the double-jeopardy issue for the first time on appeal. Appellant correctly cites authority that we may review an unpreserved double-jeopardy claim "when the undisputed facts show the double[-]jeopardy violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no legitimate state interests." *See Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000). The State does not challenge that we should review this issue.

(1) The murders of both victims, and "both murders were committed during the same criminal transaction";

(2) The murder of the male victim when Appellant "was in the course of committing or attempting to commit the offense of burglary of a habitation"; and

(3) The murder of the female victim when Appellant "was in the course of committing or attempting to commit the offense of[ ]burglary of a habitation."[11]

The jury found Appellant guilty on each of the three counts. Appellant received a sentence of life without parole for each count.

The Fifth Amendment of the United States Constitution provides that no person shall have life or limb twice put in jeopardy for the same offense. U.S. Const. amend. V. Generally, this provision—the Double Jeopardy Clause—protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) *multiple punishments for the same offense.* *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1997); *Speights v. State*, 464 S.W.3d 719, 722 (Tex. Crim. App. 2015).

With no analysis and the most general citation of authority, Appellant argues that count one—finding him guilty under section 19.03(a)(7)(A) of the penal code for

_____

[11]Because the State abandoned the fourth and fifth counts in the indictment, we do not list them here.

murdering "more than one person during the same criminal transaction"—and counts two and three—finding him guilty under section 19.03(a)(2) of committing two murders "in the course of committing or attempting to commit . . . burglary"—constitute two separate units of prosecution and that he "could not be found guilty on both units of prosecution."

The State agrees with Appellant and cites *Graham* as guidance. *See* 19 S.W.3d at 854. As the State notes, in *Graham*, "the State presented the jury with a single, three-paragraph indictment alleging that the defendant committed capital murder by: (1) causing the death of Victim A and the death of Victim B during the same criminal transaction; (2) causing Victim A's death while in the course of robbing him, and (3) causing Victim C's death while in the course of robbing him." *See id.* While dealing with the question of jury unanimity, the court of criminal appeals categorized the indictment as alleging two crimes—that appellant murdered Victim A (1) while in the course of robbing him, and (2) during the same criminal transaction where he murdered Victim B—and concluded that these constituted alternative theories for the commission of the same crime. *See id.* The murder of Victim C while robbing him constituted a separate capital murder. *See id.* The State notes that *Graham* includes a footnote that suggests how all the theories would be melded into one whole if the third count were predicated on the murder of a victim included in the prior counts and not an unrelated individual:

33

> This would be a different case, of course, if the murder of [Victim C] was being used as an aggravating circumstance to enhance [Victim A's] murder into capital murder. *See, e.g., Shavers v. State*, 881 S.W.2d 67, 74 (Tex. App.—Dallas 1994, no pet.) (noting that although indictment contained two distinct murders, one of the murders was used as aggravating circumstance to charge a single capital murder).

*See id.* at 854 n.3.

The State offers this footnote for the proposition that "the predicate murder in a capital[-]murder count cannot be used as the predicate murder or the aggravating circumstance in another capital[-]murder count without violating double jeopardy." We agree with the State's reading of the footnote.

As espoused by the State, "Here the predicate murder of Count 2 was the same predicate murder as Count 1, and the predicate murder of Count 3 was the aggravating circumstance of Count 1." Applying the principle that we and the State both glean from *Graham*, "Counts 1 and 2 represent the same offense, and Counts 1 and 3 represent the same offense." Thus, there is single crime, not the three that Appellant was punished for.

The State is candid about this resolution conflicting with the holding of the Amarillo Court of Appeals in *Kitchens v. State*, 170 S.W.3d 837, 839 (Tex. App.—Amarillo 2005, no pet.). Because section 19.03(a)(2) of the penal code—which elevates murder to capital murder when a murder is committed during the commission of a specifically-enumerated crime like burglary or robbery—and section 19.03(a)(7)(A)—which elevates murder to capital murder when more than one person

34

is killed during the same criminal episode—have different elements, *Kitchens* concluded that each subsection of section 19.03(a) contained separate units of prosecution for which separate punishments could be assessed. *See id.* at 839. *Kitchens* does not cite *Graham*. We, however, view *Graham* as authority supporting the State's concession and its request for us to modify the judgment.

As a remedy, the State requests that we follow the instruction of *Ex parte Cavazos* when there is no clear tiebreaker to use in deciding which conviction to retain. *See* 203 S.W.3d 333, 339 n.8 (Tex. Crim. App. 2006). *Cavazos* provides the solution of retaining the conviction for the offense named in the first verdict form and rendering a judgment of acquittal for the remaining offenses. *See id.*; *see also Martinez v. State*, No. 04-17-00689-CR, 2018 WL 5928480, at *6 (Tex. App.—San Antonio Nov. 14, 2018, no pet.) (mem. op., not designated for publication) (citing *Cavazos* for the proposition that "all punishment factors being equal, the conviction that should be retained is generally the offense named on the first jury verdict form, and the court [of criminal appeals] noted that this is generally the offense charged in the first count of the indictment").

Thus, we sustain Appellant's second issue, we affirm the judgment against Appellant for the offense named on the first jury verdict form finding him guilty under section 19.03(a)(7)(A) of the penal code, and we render judgments of acquittal for the offenses listed on the second and third jury verdict forms finding him guilty under section 19.03(a)(2) of the penal code.

## V. Ineffective Assistance of Counsel

In his third issue, Appellant makes a scattershot attack on his counsel's performance at trial. His arguments portray a belief that the volume of his claims substitutes for precision in describing the deficiencies and the prejudice that resulted from them. The imprecision of Appellant's attacks and the record we have before us does not signal that trial counsel's performance was unreasonably deficient or that it prejudiced Appellant.

### A. The principles governing review of an ineffective-assistance-of-counsel claim

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const. amend. VI. To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See*

*Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9 S.W.3d at 813–14. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. Direct appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A

"reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.*, 104 S. Ct. at 2069.

## B. Appellant's challenges to his counsel's performance

Appellant launches a number of challenges to the performance of his trial counsel. At points, it is difficult to determine whether Appellant actually challenges the act or omissions raised as being a specific deficiency in performance or an example of a lackadaisical attitude. We will examine each act or omission raised by Appellant in the context of the *Strickland* standards.[12]

## C. Analysis

### 1. Appellant fails to demonstrate ineffective assistance of counsel as a result of his counsel's filing pretrial motions on the day of trial.

Appellant first criticizes his counsel for filing a host of motions on the day of trial. Although Appellant concedes that there can be a strategic purpose for waiting to file motions until the day of trial, he claims that purpose is absent in this case: "It can

---

[12]Appellant's motion for new trial raised no point complaining of ineffective assistance of counsel.

certainly be an acceptable trial strategy to wait until the last minute to file pre-trial discovery so as to not reveal too much in the way of possible defenses, but in this case, the late filing on the day of trial revealed more haste than guile." The sole fact that Appellant emphasizes to establish that his counsel's last-minute strategy was not strategic is that one of the motions filed was "Defendant's Motion to Declare Texas Capital Murder Sentencing Scheme Unconstitutional" and that it contained an obvious typo because it named a person other than Appellant as the defendant. The motion is obviously in error as it is predicated on the fact that the defendant was eighteen at the time of the offense and that the imposition of a life sentence without the possibility of parole would be a cruel and unusual punishment. Appellant was in his fifties. This isolated error does not establish that Appellant failed to receive the reasonable assistance of counsel or that the error prejudiced his defense. *See Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006) (stating that effective assistance of counsel need not be errorless and that "[i]solated instances in the record reflecting errors of omission or commission do not render counsel's performance ineffective" (quoting *McFarland v. State*, 845 S.W.2d 824, 843 (Tex. Crim. App. 1992)).

### 2. Appellant fails to demonstrate ineffective assistance of counsel as a result of the failure to conduct a *Jackson-Denno* hearing with respect to the suppression of Appellant's statement.

Appellant attacks his counsel's performance because he filed a proforma motion to suppress and made only perfunctory efforts to object to the admission of

his recorded interview.[13] Obviously, the statements made during the interview were incriminating, but Appellant does not carry his burden to demonstrate how more determined efforts to suppress the statement would have succeeded. *See Dorsey v. State*, No. 01-14-00685-CR, 2015 WL 4591790, at *6 (Tex. App.—Houston [1st Dist.] July 30, 2015, no pet.) (mem. op., not designated for publication). Without any effort to sustain this burden, this argument on ineffective assistance is also perfunctory.

Appellant is correct that much of the State's case turned on the statements made during his recorded interview. He criticizes two aspects of his counsel's performance in dealing with the interview. First, he states that "[t]rial counsel had succeeded in redacting portions of the interview [regarding] misconduct but surprisingly made no effort to redact the alleged statements of co-conspirators made to [the detective conducting the interview]." He does not identify which statements he complains of, the basis for raising an objection to them, or how the presence of the complained-of statements caused him prejudice. Conclusory statements do not lay the predicate for an ineffective-assistance claim. *See Menefield*, 363 S.W.3d at 592 ("An ineffective-assistance claim must be 'firmly founded in the record' and 'the record must affirmatively demonstrate' the meritorious nature of the claim." (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).

---

[13]He also claims that his counsel should have moved to quash his indictment on the double-jeopardy grounds we addressed in his second issue. Our resolution of that issue obviates any further complaint by Appellant.

With respect to the motion to suppress, we glean from his brief that Appellant argues that his counsel sacrificed two valid arguments. The first is based on the failure to question the voluntariness of Appellant's recorded interview when he had been questioned previously. Specifically, he questions why "there was no inquiry by trial counsel as to why Appellant was questioned twice before being arrested, what had transpired during those meetings, or whether or not he had been *Mirandized* at any point during the interviews." Our record does not reveal whether counsel asked Appellant these questions or investigated what had occurred in the other interviews or why he determined that a challenge was groundless. Second, Appellant claims that his counsel made "no effort to object to the repeated statements by co-defendants throughout the interview" and then quotes a short portion of the interview in which the detective conducting it told Appellant that he had talked to W.G. and that there were "a lot of other people involved in this situation." Again, Appellant does not tell us what statements counsel should have objected to and how his performance was deficient because of that failure.

As we understand Appellant's argument, he sets out these generalized challenges to demonstrate that counsel should have made more than a perfunctory effort to press the motion to suppress that he had filed and that this failure is further evidence of his lack of preparation. But Appellant's generalized challenges to the statement do not demonstrate any basis to exclude the statement. Ineffective assistance is not shown by the failure to file and pursue a futile motion; an ineffective-

41

assistance claim predicated on the failure to file a motion to suppress must be supported both with proof that the motion would have been granted and also with proof that the remaining evidence would have been insufficient to support a conviction:

> Trial counsel's failure to file a motion to suppress is not per se ineffective assistance of counsel. *Wert v. State*, 383 S.W.3d 747, 753 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 2587 (1986)). Counsel is not required to perform a useless or futile act. *See Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005) ("But a reasonably competent counsel need not perform a useless or futile act."); *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) ("Counsel is not required to engage in the filing of futile motions."). Rather, to satisfy *Strickland* and prevail on an ineffective assistance claim based on defense counsel's failure to file a motion to suppress, the appellant must show by a preponderance of the evidence that the motion to suppress would have been granted and that the remaining evidence would have been insufficient to support his conviction. *See Wert*, 383 S.W.3d at 753 (citing *Jackson v. State*, 973 S.W.2d 954, 956–57 (Tex. Crim. App. 1998)).

*Dorsey*, 2015 WL 4591790, at *6.

Appellant makes no effort to meet the standard that requires proof that the motion would have succeeded and left the prosecution with an inability to prove its case. Here, we also have no record by which we may test the reason for counsel's decision on whether to press the issue of suppression. Appellant's motion for new trial does not speak to the issue of ineffective assistance of counsel, and thus, we lack a record that provides the information necessary to test counsel's decision not to press the issue. *See Sewell v. State*, No. 05-15-00356-CR, 2016 WL 1402967, at *2 (Tex. App.—Dallas Apr. 7, 2016, pet. ref'd) (mem. op., not designated for publication)

("Although [the defendant] filed a motion for new trial, he did not raise his claim for ineffective assistance of counsel; the record is silent regarding [trial] counsel's reasons for the decisions he made. Trial counsel was not given an opportunity to explain his actions. The undeveloped record before us does not affirmatively demonstrate that counsel was ineffective or overcome the presumption of effective assistance of counsel." (citation omitted)). Appellant condemns his counsel for "throwing in the towel" but does not make the required showing of what would have been gained by continuing the bout.

**3. Appellant fails to demonstrate ineffective assistance of counsel as a result of his counsel's asking a question on cross-examination and of failing to object.**

Next, Appellant argues that inept questioning and a failure to object by his counsel brought the proverbial roof down on his head. But the testimony that he cites adds little to the scenario already painted for the jury through Appellant's interview. And trying to raise this issue on direct appeal is a classic example of why direct appeal is a flawed method to bring claims of ineffective assistance when there is no explanation for why counsel took or did not take an action and when the claimed missteps of counsel are not so egregious that no competent lawyer would have made them.

If we read Appellant's brief correctly, he challenges a question asked by his counsel that drew an answer from the investigating detective that he believed the victims' daughter and son-in-law "got paid off of these deaths." The first problem

with Appellant's argument is that it was the prosecutor, rather than Appellant's counsel, who asked the question. The second problem is that the answer could not have had a devastating impact because Appellant had gone into detail on this issue during his interview.

Appellant then cites testimony from the detective during his questioning by the prosecutor in which the detective says that W.G. is mentally challenged, W.G.'s mother is also a little mentally challenged, W.G. told the detective about coming to Arlington with Appellant, and they were sent with a key from Dephne. Appellant categorizes the testimony as "replete with inadmissible hearsay, leading questions, and speculation" and as subject to a request for mistrial. Other than the statement that W.G.'s mother is a bit mentally impaired, the remaining statements conveyed information that the jury had heard in Appellant's interview and from other sources. Appellant does not tell us what an objection would have gained him or how he was prejudiced by the jury's hearing information that it already knew.

The same sound-and-fury approach marks Appellant's argument that his counsel erred when he allowed the prosecutor to ask the detective if he were able to corroborate what W.G. had told him. Again, even if the question were objectionable, Appellant had already corroborated what W.G. had told the detective.

Finally, Appellant references a line of testimony in which the detective testified that Dephne did not know that Appellant was a black male and thought that he was a member of the special forces because he wore a colonel's uniform. We agree that this

44

testimony is curious; we have read the trial record and have no idea what it means. Appellant does not tell us its significance, and we can only assume that rather than prejudicing Appellant, it confused the jury as much as it does us.

Thus, Appellant has presented a number of questions that perhaps should have drawn an objection. Counsel may have had a sound reason for why he did not object, and with the record we have before us, counsel has not had the opportunity to give us that reason. And when considered in the context of what the jury already knew, we conclude that the testimony is not of such moment to cause us to question the reliability of the result in Appellant's trial.

### 4. Appellant fails to demonstrate ineffective assistance of counsel as a result of his counsel's alleged failure to request a limiting instruction on the evidence regarding the murder-for-hire scheme.

Finally, Appellant claims that his counsel did not protect him when the State dropped its capital murder counts for murder for remuneration. He describes this failing as "trial counsel's failure to request an instruction on the State's abandonment of counts four and five and to disregard all evidence regarding the murder[-]for[-]hire scheme or to require the jury to treat it as an extraneous[-]offense allegation." We interpret Appellant's argument as complaining that the evidence that he was hired to kill the victims was no longer relevant after the State dropped the murder-for-remuneration counts. Appellant does not tell us why this testimony would not be relevant on the issue of motive.

And he does not acknowledge that the charge contained the following instruction:

> You are instructed that if there is any testimony before you in this case regarding the defendant having committed an offense other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

Appellant does not tell us why this instruction fails to address the concern he raises. An ineffective-assistance claim must stand on something more than a conclusory statement that counsel should have explored an alternative other than what he did when there is no explanation what that other alternative is, how the other alternative would have impacted what had already occurred or what the jury already knew, why counsel should not be given an opportunity to explain why he did not explore the other alternative, and how the failure to explore the other alternative prejudiced Appellant. *See Gomez v. State*, 552 S.W.3d 422, 432 (Tex. App.—Fort Worth 2018, no pet.) ("To establish ineffective assistance of counsel, Appellant must show by a preponderance of the evidence that his counsel's representation was deficient *and* that the deficiency prejudiced the defense." (emphasis added) (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; and *Nava*, 415 S.W.3d at 307)).

46

Because none of Appellant's ineffective-assistance-of-counsel claims meet *Strickland*'s two prongs, we overrule Appellant's third issue.

## VI.  Conclusion

Having overruled Appellant's first and third issues but having sustained his second issue, we affirm the judgment on count one in which the jury found Appellant guilty of capital murder under section 19.03(a)(7)(A) of the penal code but reverse and render judgments of acquittal on counts two and three in which the jury found Appellant guilty of capital murder under section 19.03(a)(2).

Per Curiam

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  June 20, 2019